FILED
LODGED

MP/JS: USAO 2008R00265

NOV 0 5 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DISTRICT OF MARYLAND
BY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | (Money Laundering, 18 U.S.C. §§ 1956 |
| | * | and 1957; Witness Tampering, 18 U.S.C. |
| WALTER LLOYD BLAIR, | * | § 1512; Obstruction of Justice, 18 U.S.C. |
| | * | § 1503; Failure to File Tax Return, |
| Defendant. | * | 26 U.S.C. § 7203; Aiding and Abetting, |
| | * | 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 982) |
| | * | |

*******

**PJM 08 CR 0505**

## INDICTMENT

## COUNTS ONE THROUGH EIGHT

(Money Laundering)

The Grand Jury for the District of Maryland charges that:

**Background**

1.      The defendant, **WALTER LLOYD BLAIR**, was a native of Jamaica, and between at least 2002 through 2005, a resident of Silver Spring and Brookeville, Maryland.  During that time, defendant **BLAIR** practiced law in the State of Maryland, and maintained offices in College Park, Maryland, and the District of Columbia.  Defendant **BLAIR**'s legal practice involved, among other things, the representation of plaintiffs seeking monetary damages and defendants charged with criminal offenses.

2.      An individual identified herein as "the drug dealer" was a native of Jamaica, and a resident of Richmond, Virginia.  The drug dealer operated a large scale marijuana distribution organization in the Richmond area.  The drug dealer lived with his girlfriend and her minor son until they were killed in the fall of 2003.

3.     A distant relative of the drug dealer, identified herein as "relative A," was a native of Jamaica and a resident of Germantown, Maryland.

**The Defendant's Plan To Launder Drug Proceeds**

4.     Between in or about August and October, 2003, the drug dealer provided relative A with a safe to maintain in her household. The safe contained tens of thousands of dollars in proceeds from the sale of drugs. On or about October 25, 2003, the drug dealer's girlfriend was found in their residence dead from a gunshot wound to the head. The drug dealer and the minor son initially were missing; later they also were found shot to death.

5.     After learning of the drug dealer's disappearance and his girlfriend's killing, relative A and a colleague contacted defendant **BLAIR**.   Relative A sought legal advice in connection with the safe that the drug dealer maintained at her house, among other things.  On or about November 4, 2003, relative A and a colleague met with defendant **BLAIR** at his office in Maryland and explained the circumstances of her receipt of the drug dealer's safe. After learning about the circumstances surrounding the drug money in the safe, defendant **BLAIR** devised a plan to conceal the true nature, ownership and source of the drug proceeds.

6.     First, defendant **BLAIR** directed relative A to retrieve and deliver to him the contents of the safe. As instructed, relative A and her colleague retrieved the currency from the safe, which they delivered in a duffel bag to defendant **BLAIR** at his College Park office.  Defendant **BLAIR** counted and initially retained the contents of the duffel bag – tens of thousands of dollars in U.S. currency, in various denominations, packaged in individual stacks wrapped in rubber bands.  In an attempt to conceal the true nature of the drug proceeds, defendant **BLAIR** created a false story about its ownership and source, which he explained to relative A and her colleague.  To that end, defendant

-2-

**BLAIR** further advised relative A to use the funds to purchase real estate, and that he would assist her in that regard.  He also advised that he would assist her in using the currency to pay for lawyers for the drug dealer's associates, including himself.  Defendant **BLAIR** did not file the required IRS form to report the receipt of more than $10,000 in currency in connection with his law practice.

### Drug Proceeds Used to Purchase Real Estate

7.     To facilitate the purchase of real estate with the drug proceeds, defendant **BLAIR** directed another lawyer in his office to form a corporation to be controlled by relative A.  The corporation was formed as Jay Paul Property Management, Inc.  Defendant **BLAIR** advised that the corporation would be used to purchase real estate with the funds from the safe.  On or about November 7, 2003, defendant **BLAIR,** accompanied by relative A, opened an account in the name of "Blair and Associates LLC for Jay Paul Property Management" at the SunTrust Bank branch in Riverdale, Maryland ("the SunTrust account").  Defendant **BLAIR** and relative A deposited $6,000 in currency from the safe into the SunTrust account, and retained $1,000 in cash.

8.     Defendant **BLAIR** also contacted a mortgage broker ("the broker") to assist relative A in purchasing real estate with funds from the safe.  To that end, on or about November 6, 2003, defendant **BLAIR** provided the broker with $9,000 in currency from the safe to be used to purchase real estate for relative A.  Defendant **BLAIR** falsely characterized the nature, ownership and source of the funds to the broker.  On or about November 7, 2003, relative A and the broker opened an account at BB&T Bank in relative A's name ("the BB&T account"), into which they deposited $9,000 in currency from the safe.

-3-

9.      On or about November 11, 2003, defendant **BLAIR** provided the broker with an additional $31,000 in currency from the safe to be used to purchase real estate for relative A. On or about November 17, 2003, the broker deposited another $2,000 in currency into the BB&T account, and more than $6,000 in checks from an account he controlled.

10.     In or about late November, 2003, the broker identified real estate for relative A to purchase in Washington, D.C. ("the Washington property") and Emmitsburg, Maryland ("the Maryland property"). Relative A agreed to purchase the properties, and wrote checks for that purpose from the BB&T account that contained currency from the safe. In particular, on or about November 22, 2003, relative A wrote a check for $2,000 from the BB&T account as a down payment on the Washington property. On or about November 28, 2003, relative A wrote a check for $5,000 from the BB&T account as a down payment on the Maryland property.

11.     On or about December 8, 2003, an additional $7,000 in currency was deposited into the BB&T account. In connection with the purchase of the Washington property, on or about January 8, 2004, relative A used funds from the BB&T account to purchase a bank check payable to a title company for $12,432.31. On or about April 4, 2004, the broker deposited a check for $9,995 from an account he controlled into the BB&T account. In this way, defendant **BLAIR** caused thousands of dollars in bundles of currency from drug dealing to be converted into legitimate appearing residential real estate.

### Drug Proceeds Used to Pay Attorneys' Fees

12.     Defendant **BLAIR** also used some of the drug proceeds to pay lawyers, including himself, to represent two of the drug dealer's associates. On or about October 26, 2003, federal and local law enforcement agencies initiated a criminal investigation into, among other things, the drug

-4-

dealer's operation, the murder of the drug dealer's girlfriend, and the whereabouts of her minor son and the drug dealer.  On or about November 5, 2003, a federal grand jury in the United States District Court for the Eastern District of Virginia returned an indictment charging the drug dealer's associates with violations of federal drug laws.  Defendant **BLAIR** represented one of the drug dealer's associates; the case was pending between at least November 2003 and July 2004.

13.     On or about November 12, 2003, defendant **BLAIR** used $20,000 to purchase two bank checks in the amount of $10,000 each for two lawyers representing the drug dealer's associates. Defendant **BLAIR** also deposited $10,000 for himself into his firm's bank account that held funds in trust for his clients ("the trust account").  In addition, on or about December 17, 2003, defendant **BLAIR** purchased two bank checks payable to a lawyer representing one of the drug dealer's associates.  To purchase the checks, defendant **BLAIR** used funds that included money from the SunTrust account, into which currency from the safe had been deposited.  On or about December 20, 2003, defendant **BLAIR** also wrote himself a check for $4,000 from the trust account for his legal services to the drug dealer's associate.

### The Charges

14.     On or about each date listed below, in the District of Maryland, the defendant,

### WALTER LLOYD BLAIR,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, which in fact involved the proceeds of specified unlawful activity, that is, conspiracy to distribute narcotics and distribution of narcotics under 21 U.S.C. §§ 846 and 841, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and that the transaction was designed in whole and in part to conceal and disguise the nature, location,

source, ownership, and control of the proceeds of specified unlawful activity, by engaging in, and

willfully causing others to engage in, each transaction described below:

| Count | Transaction Date | Description of Transaction |
|-------|------------------|----------------------------|
| 1 | November 6, 2003 | Transfer of more than $70,000 in currency from relative A to defendant **BLAIR**. |
| 2 | November 6, 2003 | Transfer of $9,000 in currency from defendant **BLAIR** to the broker. |
| 3 | November 7, 2003 | Deposit of $6,000 in currency into an account at SunTrust Bank, a financial institution, by defendant **BLAIR**. |
| 4 | November 11, 2003 | Transfer of $31,000 in currency from defendant **BLAIR** to the broker. |
| 5 | November 22, 2003 | Transfer of check number 97 for $2,000 drawn on an account at BB&T Bank, a financial institution, from relative A to the seller of the Washington property. |
| 6 | November 28, 2003 | Transfer of check number 99 for $5,000 drawn on an account at BB&T Bank, a financial institution, from relative A to the seller of the Maryland property. |
| 7 | December 17, 2003 | Purchase of official check 4968008418 for $6,000 from SunTrust Bank, a financial institution, by defendant **BLAIR** payable to a lawyer. |
| 8 | January 8, 2004 | Purchase of official check number 72957458 for the amount of $12,432.31 from BB&T Bank, a financial institution, by relative A. |

18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 2

-6-

## COUNT NINE

(Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 13 of Counts One through Eight are incorporated here.

2.      On or about November 12, 2003, in the District of Maryland, the defendant,

## WALTER LLOYD BLAIR,

knowingly engaged and attempted to engage in a monetary transaction in and affecting interstate commerce in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, that is, conspiracy to distribute narcotics and distribution of narcotics under 21 U.S.C. §§ 846 and 841, by purchasing bank checks numbered 4968008206 and 4968008208 at SunTrust Bank, a financial institution, totaling $20,000.

18 U.S.C. § 1957(a)
18 U.S.C. § 2

## COUNT TEN

(Witness Tampering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 13 of Counts One through Eight are incorporated here.

2.      On or about November 12, 2003, a Special Agent of the Federal Bureau of Investigation contacted relative A to conduct an interview regarding her knowledge of matters relating to the drug conspiracy, including the whereabouts of the girlfriend's minor son. Defendant **BLAIR** advised relative A not to reveal to the FBI information relating to the drug dealer's currency from the safe, and further advised that if the FBI inquired in that regard, to provide false information.

3.      In or about November 2003, in the District of Maryland and elsewhere, the defendant,

## WALTER LLOYD BLAIR,

attempted to and did (a) corruptly obstruct, influence, and impede an official proceeding, and (b) knowingly corruptly persuade another person, namely relative A, with intent to hinder and prevent the communication of information relating to the commission and possible commission of a Federal offense to a law enforcement officer of the United States, that is, an agent of the Federal Bureau of Investigation.

18 U.S.C. § 1512

-8-

## COUNT ELEVEN

(Obstruction of Due Administration of Justice)

The Grand Jury for the District of Maryland further charges that:

1.        Paragraphs 1 through 13 of Counts One through Eight are incorporated here.

2.        On or about November 11, 2003, counsel for one of the drug dealer's associates informed the Virginia federal court that he and defendant **BLAIR** would represent the associate, who was charged with a federal drug offense. On or about November 17, 2003, defendant **BLAIR**, who was licensed to practice law in Maryland, prepared and submitted to the Virginia federal court a written motion requesting permission to practice in that court for that case only. To secure permission to represent the drug dealer's associate, defendant **BLAIR** represented to the Virginia court that he had not been reprimanded in any court and that there had not been any action in any court pertaining to his conduct or fitness as a member of the bar. In fact, in connection with his practice of law, defendant **BLAIR** had been reprimanded for obstructing justice by the Supreme Court of Appeals of West Virginia, and had been charged with intimidating witnesses in a criminal action in West Virginia.

3.        Between November 2003 and July 2004, in the District of Maryland and elsewhere, the defendant,

### WALTER LLOYD BLAIR,

corruptly influenced, obstructed and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice, namely, the ongoing federal criminal prosecution involving the drug dealer's associate in the United States District Court for the Eastern District of Virginia.

18 U.S.C. § 1503

## COUNTS TWELVE THROUGH FOURTEEN

(Failure to File Tax Returns)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 13 of Counts One through Eight are incorporated here.

2.     During each calendar year listed below, defendant **WALTER LLOYD BLAIR** had and received gross income substantially in excess of the amount that would trigger the requirement to file an individual income tax return with the Internal Revenue Service.  As a result, he was required by law, after the close of the calendar year, and no later than April 15, to make an income tax return to the Internal Revenue Service, which would state specifically his gross income and any deductions and credits to which he was entitled, and pay any applicable taxes.

3.     For each calendar year listed below, defendant **BLAIR** requested an extension of time in which to file his individual income tax return.  As a result, he was required by law, no later than the filing date listed below, to make an income tax return to the Internal Revenue Service, which would state specifically his gross income and any deductions and credits to which he was entitled.

4.     On or about each date listed below, in the District of Maryland and elsewhere, the defendant,

## WALTER LLOYD BLAIR,

knowingly and willfully failed to make and file with the Internal Revenue Service an individual income tax return in his name for each calendar year listed below.

| Count | Filing Date | Calendar Year |
|-------|-------------|---------------|
| 12 | August 15, 2003 | 2002 |
| 13 | August 16, 2004 | 2003 |
| 14 | August 15, 2005 | 2004 |

26 U.S.C. § 7203

## FORFEITURE ALLEGATION

1.      As a result of the offenses alleged in Counts One through Nine, defendant **WALTER LLOYD BLAIR** shall forfeit to the United States any property, real and personal, involved in such offense and any property traceable to such offense, including but not limited to a sum of money equal to the amount of proceeds involved in and traceable to such offenses.

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property, including but not limited to the following:

i.      real estate identified as 2600 Sunshine Court, Brookeville, Maryland; and

ii.     real estate identified as 4701 Melbourne Place, College Park, Maryland.

18 U.S.C. § 982


ROD J. ROSENSTEIN
UNITED STATES ATTORNEY


A TRUE BILL:


**SIGNATURE REDACTED**   November 5, 2008


-12-